M.D. et al oral argument, 15 minutes per side. Mr. Kuhn for the appellant. Good afternoon. Good afternoon and may it please the court. Matthew Kuhn for the Commonwealth of Kentucky. I'd like to reserve three minutes for rebuttal. Okay. This case at bottom reduces to a who decides question. Who decides whether certain medications to treat gender dysphoria in children are permitted within Kentucky's borders? Is it Kentucky's General Assembly or is it Article III courts? In passing Senate Bill 150, Kentucky's legislature carefully examined the alleged benefits and the risks attendant to these treatments and reasonably decided that these risks are simply too much to tolerate for Kentucky's children. Kentucky's legislature had the sovereign prerogative to make this judgment call. In Wayland against Roe, the Supreme Court found it, quote, well settled that the state has broad police power in regulating the administration of drugs by the health professions. Now, the fact that the plaintiffs and their favored medical interest groups disagree with Kentucky's judgment does not lessen Kentucky's sovereign prerogative. As the Supreme Court recognized in Gonzales v. Carhartt, and I think this goes to the fact question that was asked at the outset of the earlier argument. In Gonzales, the Supreme Court said that state legislatures have, quote, wide discretion to pass legislation in areas where there is medical and scientific uncertainty. So the fact that there is disagreement about the effectiveness and risks of the treatments at issue does not empower the district court to decide who's right on the science. No, that disagreement is reason enough to respect Kentucky's sovereign decision to pass Senate Bill 150. I think the plaintiffs would argue that the only disagreement is between doctors and non-doctors. That is, if it's if you're focused on the medical profession, the relevant experts, there's not disagreement. How do you respond to that argument? So I think that I would dispute the factual premise of that. You know, we put in to the Are there medical organizations that have? The medical organizations have not filed an amicus brief in that. But Kentucky does not have to outsource its sovereign power to medical interest groups. You know, Dobbs essentially said that Kentucky had that same issue in an abortion case before this court in 2019. And this court rejected that and said that Kentucky gets to look at the evidence and gets to make sovereign decisions subject to the backstop of rational basis review. I do think, as was mentioned in the prior argument, that the experience of these European countries, which is where many of these treatments were developed, that they're now walking back their earlier embrace of things, is something that Kentucky in its sovereign power can take account of. We can exercise caution in protecting our and we can make a different decision than, for example, California does. That is a feature, not a bug, of our federal system. The only position our Constitution takes on this hotly debated topic is that the states play a frontline, indispensable role in regulating the practice of medicine. If I can pick up on the point that was discussed earlier about whether there is sex discrimination here based on the fact that some treatments are allowed and others are not, the reality of this is what Kentucky has done has chosen a particular condition and has chosen particular treatments for that condition and restricted that. That is not a sex discrimination issue. That's regulating the practice of medicine. And I think the way to tease that out is to look at the relief that the plaintiffs would secure if that theory were to carry the day. In that circumstance, Kentucky would not be able to regulate puberty blockers or would not be able to regulate puberty blockers or cross-sex hormones if they would have to allow it for all treatments or no treatments. That is not a sex discrimination remedy. What that is doing is tying Kentucky's hands in regulating the practice of medicine. And I think the point from earlier is exactly right, that this theory of sex prohibition on sex surgeries for minors that is in our bill that has not been challenged. If the procedures at issue here are subject to heightened scrutiny, so is the prohibition on surgeries. And this court is going to be called into fact-finding about how far is too far, what does the evidence say, this doctor said this, this doctor said that. And I think that when we realize what's going to happen, that is better served for a committee room in Frankfurt. One way the states have distinguished Bostock is to say, well, the 14th Amendment language is different from Title VII. I'm just curious, what about the language proves that the Equal Protection Clause doesn't have this Bostock component to it? A couple of points. One, the language of the 14th Amendment, of course, was there when Congress chose to pass Title VII and they chose to use different language. And I think that the result in Bostock was driven by this sort of but-for analysis that relates to because of. Of course, that's not in the equal protection context. I think it's helpful to point out that we talked about it in our reply brief. The plaintiffs bring up the Gilbert case to say that the standard for sex discrimination is the same in the equal protection context as it is in Title VII. Well, Gilbert actually read into Title VII the rule from Gdoldig, and Congress came back and overruled that and said, no, we we want to change that. Of course, they cannot change Gdoldig in the context of the Equal Protection Clause. So I think rather than isn't in the students for fair admission, didn't the majority Title VI is similar to Title VII? Didn't they equate Title VI to the Equal Protection Clause there? And then what about our Smith case where we did the same in the Title VII context? So again, it's a different question with respect to Title VI. But the point that if you to liquidate the meaning of the Equal Protection Clause, I think we have to to go to the precedents, the VMI precedent. And I think the court was right in its motion panel decision to say that if you're going to read Bostock into the Equal Protection Clause, you're going to run up against Gdoldig and Dobbs. You're going to create tension with that. And Judge Lepore, I think the same is true with the Smith decision, that if you're going to incorporate this this logic into the Equal Protection Clause, again, you're going to run into tension with Dobbs and Gdoldig. You know, another point, Mr. Hildebrand made this point earlier, but I'll develop it a little bit more, that the Smith case was based on, you know, how an adult dresses or behaves in the workplace. This is not a workplace case. This is a medical office case. This does not involve adults. This involves children, you know, dealing with... You know, I get all that. But then I say to myself, you know, gender dysphoria does go to the same things. You know, what am I supposed to look like? How am I supposed to act? And I'm having a lack of alignment between what's going on in my head and what my body's saying. So I guess I'm... I hear what you're saying. I get the difference between medicine and employment. But I also understand, or at least I think I understand Plano's point, that isn't there still a fair bit of overlap? So I think the operative point, though, is that when it comes to the state's police power to regulate the practice of medicine, we have broad power there. And again, you're not dealing with regulating the practice of medicine. You know, Bostick tells us that you can't distinguish on the basis of sex as it relates to transgender status and sexual orientation in the workplace. But, you know, biologically speaking, when it comes to medical treatment, there are differences. One's biological sex very much determines what treatments are permissible. And that's why we have Dobbs and Godoldig that allow states to regulate treatments in this way. I think one of the other arguments that the plaintiffs have made is that there are these sex-laden terms in Senate Bill 150. And I think that that is to be expected, given that we're describing a medical... a condition and treatments that relates to biological sex. I think the Agnes Tucker decision was exactly right on this, that it's hard to imagine a way that Kentucky could regulate this condition and these treatments without mentioning biological sex. Again, the same is true with respect to surgery. So that part of... But what if you just... why couldn't you say gender dysphoria is a disease? If there was a range of treatments, some of them are psychological. Those are the only ones permitted in our state. Leave it at that. Anything that goes beyond that, you don't use the word sex. You just say there's invasive and there's non-invasive. We're banning the invasive for minors. So if you use the term gender dysphoria rather than... Again, I mean, I think that I go back to the Dobbs decision, the statute there used the word woman. And I think that that's sort of becoming too formalistic if I can, Chief Judge Sutton, in the sense that we're operating in Dobbs and Godoldig world where we're regulating a medical treatment that only one sex can undergo. And so it's just unsurprising that there is a sex-laden term. It's Kentucky accurately describing the treatments for a condition that it's doing. And so I think if the court were to require us to describe things in something that definitionally relates to biological sex in non-biological sex terms, you're going to hem us in in all manner of medical treatment. I'm a little embarrassed to ask this question because I'm afraid it conveys a lot of ignorance. But if you look at the cases and you respect the Bostock approach, in other words, you say it's totally right. That's how this all works for Title VII of the Constitution, hypothetically. Does the word gender trigger the same level of review? In other words, not sex, but the word gender. Are you in the same land when you use that word? If you honor Bostock and you say this is how this works, if you change every word from sex to gender, I'm assuming you can for the sake of argument. Do you know how that works? I'll admit to not having thought about that. I do think Tennessee's brief talked about how at the founding, the terms sex and gender meant the same thing. Again, the common definition, folks treat the two as the same as well. The Supreme Court has done that in some of its sex discrimination cases. I don't know how that liquidates or reduces down to. My instinct would be very strange to say they don't get the same It would be strange to think all bets are often won, but the other one you have heightened review. But I just don't know. I don't know of any Equal Protection Clause precedent that imposes such a kind of magic words that if you use one term but not the other that you're going to trigger sex discrimination. We don't have a sex classification here. We are regulating medical treatments for a condition that relates to biological sex and to require states to just ignore that fact. All in service of the Equal Protection Clause is just to handcuff them and regulating medicine. Okay, thank you very much, Mr. Kuhn. You'll get your full rebuttal. And is it Ms. Schuster? Have I got it straight? Yes, your honor. Good afternoon. Good afternoon. Thank you. May it please the court. I'm Stephanie Schuster here on behalf of the Kentucky plaintiffs. I recognize the court has spent a lot of time with these issues already today and in its prior preliminary ruling. So I'd like to jump right in and start by focusing on the ways that Kentucky's law relies on express sex-based classifications that trigger heightened scrutiny for purposes of the Equal Protection Clause. First, the statute expressly draws lines based on sex. Puberty blockers and hormone treatments are banned if used for the purpose of attempting to alter the appearance of or to validate a minor's perception of the minor's sex if it's different with the minor's sex as identified at birth. Whether treatment is allowed or prohibited then expressly turns on the matter of the statute's text on the patient's sex. You have to know the patient's sex to know whether treatment is banned or to know whether it is allowed. And that is the textbook definition of a sex-based classification. Ms. Schuster, how do you deal with what, and I'm sorry to interrupt you, how do you deal with what Mr. Kuhn was just saying, which is they had to write it that way to prescribe the care and that proves that, in essence, I'm summarizing that Dobbs and Gedulig control. How would you deal with that argument? Certainly, I understand the question, Your Honor. I actually think that the fact that the legislature had to write it that way in order to get at the result that they want is what distinguishes this from Dobbs and Gedulig. And Dobbs and Gedulig, when you're regulating pregnancy, to refer to a pregnancy or an abortion had by a woman would be redundant. You don't need to say it and you don't have to say it in those laws. Would Chief Judge Sutton's hypothetical then be fine? Would you remind me of the hypothetical? Just use the word gender? No, the word gender and the word sex, for the same reasons, you're drawing sex-based lines for the same reasons that discrimination on the basis of transgender status is inherently sex-based, discrimination on the basis of gender or sex is inherently sex-based, and as my colleague mentioned. I mean, if everyone agrees there's a disease and the disease has a component to it that relates to gender or sex, it seems very strange to me that you're presumptively in the wrong space when you regulate it. It's not like they're making the disease up. I mean, it's one thing to make a disease up, then use that as a pretext to impose some regulations. If everyone agrees there's a disease and that it's quite fair to use words like gender or sex in describing the condition, I mean, that does seem odd. So, a few responses to that, Your Honor. First, this is not a statute that regulates gender dysphoria. The words gender dysphoria do not appear anywhere in the text of the statute. This is a statute that regulates the alignment between a minor's perceived sex, their gender identity, I'm paraphrasing, and their sex assigned at birth. That is, but just again, I don't want to quibble, but that's not, isn't that the definition of gender dysphoria? It is the definition of gender dysphoria, but to, I mean, just follow this through, Your Honor. The treatment ban is not, this is not a case of a regulation that just happens to regulate a single medical procedure that has a disparate impact on a particular identified group, and that becomes very clear, one, by looking at the text, but also by looking at this ban in its broader context. The treatment ban is part of a broader bill, SB 150, that makes clear that it is targeting transgender youth in many respects, not just regulating a medical procedure. It expressly prohibits schools from requiring or even recommending that teachers or students use a transgender student's preferred pronouns. It prohibits instruction or even discussion of gender identity issues in the classroom. But isn't that, explain to me, I'm sorry to interrupt, explain to me how, I'm sorry, I'm lost, how that seems to ban everyone, not just one sex or the other. In other words, that seems to apply equally to everyone, and when you're talking specifically about the medical treatment, and maybe I'm simplifying this too much, and you should tell me if I am, then you're talking about a specific sex, because it's, one sex needs one type of medical treatment, and another needs another. So explain to me, it seems to me those, to me, seem like apples and oranges, but you should explain why I'm wrong. I will, your honor, and two responses. One, the reason I'm mentioning the context of the law is because Dobbs and Gadaldig, what they hold is that regulation of a medical procedure that only one sex can undergo is not necessarily a sex-based classification, because on its face, absent evidence of pretext, you're looking at a mere disparate impact. Here, that other context shows that this is purposeful disparate treatment. Oh, so this is really important, I mean, because I get the pretext point, but, and, you know, I will say I wondered that very thing when I first looked at the law, but what strikes me, and I want you to respond to this, what strikes me as cutting the other way is the reality that they're not banning any of these procedures once you hit 18. I mean, it's very strange to say you're protecturally going after a group when, once the group hits 18, which, God willing, is a very long part of their life, they have access to all of this. So I find that strange to call that anything justifying heightened review. Well, the base, I want to sort of make sure we're looking at this from the proper analytical framework. There's a two-step framework that the Supreme Court has required to be applied in these cases, and the first is to assess what sort of classification you have, and that determines, that dictates the level of scrutiny. All of these other issues about the context determine whether or not it is justified and whether the discrimination is constitutional or unconstitutional, but at the threshold level, what having a sex-based classification is alone what triggers heightened scrutiny. Yeah, but I took you just, maybe I misunderstood your argument. I took you to be dealing, using the point in Dobbs and Gadaldig that you can't just get away with it by saying, well, we had to mention the word because it's inherent to the subject of the regulation because that could be manipulated. So you have that qualification, and then I took you to be saying the qualification applies here because of other things the Kentucky legislature's done. So I think it's a good argument. I don't want to, you know, I don't think it's a good argument, but I'm saying in response, I think one has to come to grips with the broader picture that at 18 and over, this whole treatment thing disappears, and that does seem to be consistent with the explanation for the regulation and separate from any animus towards those with gender dysphoria. Well, we would disagree because the evidence in shows that withholding treatment, even up until the age of 18, withholding treatment and allowing puberty to occur consistent with the sex identified at birth is extraordinarily harmful to these children. And what this regulates is not just procedures that they can't get until the age of 18, but it's many aspects of these children's lives while they're in school and able to get treatment that is medically indicated and medically necessary for them to live and develop into functioning, happy adults. I mean, to me, this gets to the nub of the case. I think it's your best point that you have this range of years, adolescence, where the lack of alignment problem expands in a very significant way, which would create deeper anxiety. And to the extent the condition stays the same, you've made surgery look like the kind of thing you might need. But I will say on the other side of the case, I mean, I feel like there's compassion both directions. I mean, people are saying, gosh, it's only since 2012 that we have allowed cross hormone treatments. I mean, that's accepting WPATH as the experts. So that's pretty recent in this country. And it seems like it's only the last five years that a lot of this has happened. And it does seem to me, it's not crazy to say there's a component to the other side of this, that maybe this is the kind of thing some people might regret if they do it at age 14, 15. Certainly, your honor. Well, so a few responses. One, these medications are being provided to minors for treatment, in particular, of gender dysphoria for more than 20 years. That's what the expert evidence shows in the record here. Not just since 2012, but we're talking for more than 20 years. I think 2012 is when it was okay to take the used to be 16 and over. And your challenge is not to 16 and over your challenges to everything. And so it's only in 2012, that it's the whole range. And even with that, we have a long range of observational data, as well as longitudinal studies and expert evidence that is really, as your honor mentioned, in the earlier argument, and in this one is really untested and unmatched by anything on the other side. The doctors that submitted evidence on the other side are doctors with no experience practicing in this field, with one exception, Dr. Levine. That's the one expert that actually has relevant experience. And he's the one expert that said that a ban is inappropriate. But isn't that a little circular to say you have to have the experience to form the opinion? And then what about Europe? Because the states point to Europe as well. Certainly. So having to have the experience to form the opinion, that's just traditional Daubert standards of what qualifies for a reliable expert testimony. And that's in the sense of which I'm referring to it. So you have expert testimony that's reliable and for the court to factor into its analysis. As far as Europe, none of the European countries are banning these procedures the way that Kentucky has. What you've seen is certain reports, no studies, but certain policy statements and reports urging some additional caution and urging the providers in those countries to follow guidelines like the endocrine society guidelines, which are conservative and rigorous, and which are the guidelines that represent the established standard of care already followed and that already prevails here in the United States. You do not have any European countries that are saying we need to ban these treatments. You're saying we have to use caution, but nobody's disputing that. Is anybody in Europe relying on their court to construe an implied guarantee as the way to decide what you can and can't do? I certainly don't know the answer to that, Judge Sutton. I'm not familiar with the constitutional law or the litigation in those other countries, but I can say that it is within the court's province to, when there is a sex-based classification, to apply heightened scrutiny. Courts are well-equipped and well-experienced in relying on expert evidence and understanding if a state's proper justification is what it is claimed to be, if it's hypothetical or speculative, or if it's legitimate, and if it's substantially related to an important governmental interest or a compelling one. That's something the courts are well-equipped to do, and it's an important obligation of the courts when constitutional rights are at play. I assume that probably goes to the answer to a question I had, which is take 13, 14-year-old. There must be some level at which one would be nervous about the capacity of the child to consent. The strongest thing you have going for you is you have the children, the parents, the doctor saying, this is what this individual needs, and who's the state to say. I do wonder at certain ages whether it's fair to include the child. You can't imagine an age which you're too young to consent, but I take it you would say, well, that just comes out in the wash of applying intermediate scrutiny, and it's possible that there are ages where consent is going to be a troublesome concern. I'd say at a high level, yes, that'll come out in the balancing, but just to address the specific point, what we're dealing with in this case, this is a ban on medications there. It's undisputed, as the district court found, that are only applied post-puberty, once the onset of puberty has begun. You're not dealing with very, very young children. You're dealing with adolescents, and what the record shows about the clinical practice guidelines that are followed in Kentucky and throughout the country are that there's an assessment of the child's ability to understand the implications and the costs, the risks and benefits of treatment along with the parent, and that you don't need just parental consent or just the doctor's recommendation, but they actually require the assent of the patient as well. There are many meetings, and this is all outlined in great detail, and this is the evidence the district court relied on. This is all captured in these practice guidelines, which, as I mentioned, are quite conservative, and they are focused on making sure that the child has a role to play. This is not parents making these decisions in a vacuum or just a doctor deciding what will happen with the child. To that point, my colleague, just to turn quickly because I see my time's almost expired, my colleague started this case by saying this is a question about who decides, saying, the state or the courts. I would submit that I agree it's a question about who decides, but it's a question about who decides, the parent or the state, whether the state can usurp the authority of a fit parent, a parent who is presumptively acting in the best interest of their child, to make decisions about directing that child. If we think of it that way, and I'm quite sympathetic to the authority of parents to make decisions about their children, and that explains some cases that allow children to refuse treatment, but the idea that parents can require treatment that's otherwise been regulated strikes me as having some serious slippery slope problems. I'm just not sure how to handle that. We know adults don't have that right. See Glucksberg, see Abigail Lyons, and it seems funny to say, well, the adult now with the child can do something they couldn't do for themselves, which is to say, require treatment that the FDA, the state, whatever, has decided to regulate. I can't quite figure my way out of that one. If I can attempt to help, Your Honor, I will. Abigail Lyons and Glucksberg both dealt with types of treatment that were outside the standard of care. What the Supreme Court recognized in the Parham case was that parents have a fundamental right, not just to direct the medical care. Parham is a funny case. That's a procedural due process case in which the statute was upheld. This is a substantive due process case in which you're saying the legislature has no role to play. That's a big gap to me. Well, I'll push back on the premise, Your Honor. It is a substantive due process case. I know the it's on its face, both. As this court recognized in 2019 in, I'm going to say this wrong, Kanazuski, it is a substantive due process case. This court's already resolved that. They upheld the law. By definition, that makes the point dicta here. Am I missing something? They were recognizing the parents' fundamental right to seek and obtain medical treatment for their children, and in particular, to seek and follow medical advice subject to the independent assessment of a medical professional to ensure adequate protections. But there was the interplay of both the parents' rights and the child's rights in that case. But this court has already acknowledged that that was a substantive due process case, and it was, and it relied on a long line of substantive due process precedent. That even, that runs into Jacobson and Prince in those cases. I mean, there is definitely, you concede, right? There's a line where the state can be involved. Certainly, there's a line where the state can be involved, right? But there's two points where that becomes more limited. One is when you have a substantial interference with the fundamental right, not just a moderate interference, but when you have a substantial interference. But that would be true in Prince. I mean, the same things that issue in Prince. So, well, you have the substantial interference where there aren't alternative avenues for the that bans and forbids doctors and therefore usurps from parents the ability to obtain the only evidence-based effective medical treatment for this condition that their children are experiencing. And that is sufficient to trigger strict scrutiny. And then you'd have to see if the law satisfies strict scrutiny. It's not fatal in fact, but to determine whether, you know, how the balancing shakes out. And I would just point out, just coming back to one point that Judge Sutton had raised, that again, Parham was a case about parents seeking affirmative care, not about seeking to refuse care. So, there is precedent for that. And the way that the Supreme Court and this court have phrased the right to direct and make decisions about a child's medical care has been about decision-making, not about refusing or obtaining in the abstract. I see that my time has expired. So, unless the court has any other questions, we'd respectfully request that the district court's decision be affirmed. Thank you. Thank you, Ms. Schuster. Mr. Kuhn, you have your rebuttal. Sure. I'd like to make four quick points in rebuttal. The plaintiff's theory of equal protection, what it leads to is that the state is going to have to satisfy heightened scrutiny every time it regulates gender dysphoria. You know, as Judge Brasher pointed out in his separate opinion in Actus Tucker, that means even benefits that would be provided would be subject to heightened scrutiny. No other medical or no other condition in the regulation of medicine that I'm aware of requires in all cases for the state to satisfy heightened scrutiny. That's the logical implication of their argument. My second point is opposing counsel brought up this pretext issue. You need to look at all the different provisions in Senate Bill 150, even though they've only challenged the narrow one here. That argument was not made below. That argument was not addressed by the district court. That argument was not made in the briefs. It's triply waived. And to the extent the court wants to consider this triply waived argument, Chief Judge Sutton, you're right that stopping at age 18 undermines any suggestion of animus. This is about protecting our children based on concerns that the General Assembly looked at. And if you're going to consider an animus, go watch the legislative hearings where they heard from both sides. They heard from doctors. They heard from parents. They heard from children. And this was a very considered judgment by the Kentucky General Assembly. The animus argument, if you're going to address it, it cuts against, especially on this record. The third point to discuss PARM, just very quickly, I'll point out that the treatment there that was sought by the parents was approved of by the state and provided by the state. Of course, that is not authority for getting treatment that is prohibited by the state. They have absolutely no substantive due process precedent on that. And I agree with the answer to Judge DePauw's question earlier about what's the backstop. The backstop's rational basis review, but there's also an additional backstop of the political process. And that's why these extreme cases of the legislature prohibiting something that everybody unanimously loves is not going to get to a court because the political backstop is going to exist. The final point that I'll make is I want to end with the word Chief Judge Sutton used of compassion. One of the interesting parts of this case is that the plaintiffs think that Senate Bill 150 is going to cause harm to children. And the Kentucky General Assembly thinks it's to prohibit harm for children. This is a compassion measure that was passed by our General Assembly based on reviewing some of the medical expert testimony that we've talked about today. The states are very much discussing this, right? 42 states have weighed in on this court's docket. In this very case, the United States has weighed in. More debate rather than less debate is preferred on this. We do not want a decision about a practically unamendable constitution to stall this debate. It's a good thing the states are focused on this. The United States is focused on this. We'd ask the court to reverse the preliminary injunction issued below. Thank you. Thank you. Thank you, Ms. Schuster and Mr. Kuhn. Thank you for your really excellent briefs, and thank you for doing them on a short time. I hope we didn't ruin your summers. And then arguing right before Labor Day. But we're obviously trying to do this as quickly as possible, which I hope is helpful to both sides. Anyway, your arguments were terrific, and so were your briefs, so thank you very much. The case will be submitted, and have a good Labor Day weekend. Thank you. This honorable court is adjourned.